**SHELL OIL COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 82–4231.

United States Court of Appeals, Fifth Circuit.

June 17, 1983.

Thomas G. Johnson, Robert A. Hasty, Jr., Houston, Tex., for Shell Oil Co.

Thajauna Deniese Miller, Washington, D.C., for F.E.R.C.

Justin R. Wolf, Washington, D.C., for Chevron U.S.A., Inc.

Roger L. Brandt, Houston, Tex., for Getty Oil Co.

Lois Ellen Polan, Los Angeles, Cal., for Union Oil Co. of California.

Before CLARK, Chief Judge, JOHNSON, Circuit Judge, and NORMAN W. BLACK *, District Judge:

CLARK, Chief Judge:

Shell Oil Company sought an order from the Federal Energy Regulatory Commission declaring that gas produced from certain wells was entitled to a new vintage price under the rules and regulations established by the Commission pursuant to the Natural Gas Act, 15 U.S.C. §§ 717–717z.[1] With respect to one category of wells—onshore wells directionally redrilled or "sidetracked" to new locations within existing proration

---

\* District Judge of the Southern District of Texas, sitting by designation.

1. In 1978 the Natural Gas Policy Act (NGPA), 15 U.S.C. §§ 3301–3432, replaced the Natural Gas Act (NGA) as the primary framework for federal regulation of natural gas. Under section 104 of the NGPA, 15 U.S.C. § 3314, the price of gas that was previously regulated under the NGA is its NGA price on April 20, 1977 plus a monthly inflation factor. All the wells involved in this case produce gas that was regulated under the NGA. The NGPA is not directly related to this appeal.

units [2]—the Commission denied relief, relying on a rule of general application it had established in a prior adjudication to which Shell was not a party. Because the Commission has not adequately substantiated its general rule, either here or in the earlier adjudication, we grant Shell's petition for review, vacate the portion of the order that is the subject of this appeal, and remand for further proceedings.

## I

This case is a product of the vintage pricing system established by the Commission in response to its mandate under the Natural Gas Act to fix just and reasonable rates for sales in interstate commerce of natural gas for resale. *See* 15 U.S.C. §§ 717d(a), 717(b). Under this system the date the drilling of a natural gas well begins (the spud date) is normally the basis for determining the price of gas produced from that well. A uniform vintage price applies to gas produced from all wells drilled during a specified time period. The price is based on the average cost of gas production during the period. Vintaging thus is a continuation of the cost-based principles the Commission used in establishing rates on a producer-specific basis before vintaging was adopted.

Although vintaging is superior to producer-specific ratemaking in several respects,[3] it has created a perverse incentive as well. As average drilling costs have increased, the Commission has raised vintage prices to keep pace. It thus behooves producers to strive in all ways to achieve the newest price possible for their gas. In fact, were there no restrictions, a producer would often find it profitable to cap an old well and drill a new one next to it for the sole purpose of receiving a newer, higher price.

The Commission responded to this potential abuse in Opinion No. 770–A, 56 F.P.C. 2698 (1976), *aff'd, American Pub. Gas Assn. v. FPC,* 567 F.2d 1016 (D.C.Cir.1977), *cert. denied,* 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978).[4] Opinion 770–A established means to ensure that a well will qualify for a new vintage price only where there is a legitimate business reason to drill it other than the desire for a higher price. With respect to Outer Continental Shelf wells under the jurisdiction of the United States Geological Survey, the Commission determined that a Geological Survey permit would be sufficient to demonstrate the business necessity for the well and to qualify gas from the well for a new vintage price. The Commission was less willing to rely on the permit decisions of state authorities. Opinion 770–A stated:

> With respect to onshore and offshore lands under state jurisdiction, we are concerned about the possibly conflicting objectives and the varied abilities and willingness of state agencies to enforce regulations. Hence, we will require producers to justify the need for any new well or any new completion *within an established proration unit* in the same reservoir. We will require the producer to provide explanations in writing justifying the need for the new well or the new completion, including any documents filed with and received from the State Regulatory Agency. While we are hopeful that state certification will suffice in most instances, we must assure that the new wells or completions are necessary before allowing the higher prices.

Accordingly, 18 C.F.R. § 2.56a(p) is added to the Commission's Regulations to require producers to make a rate filing to

---

**2.** A proration unit is the area of a reservoir that, as determined by state authorities, can be drained adequately by one well.

**3.** Vintaging has alleviated the Commission's ratemaking burden and provided a powerful incentive, not always present where rates are determined on a producer-specific basis, for producers to lower the costs of bringing gas to the wellhead.

**4.** Opinion No. 770–A modified Opinion No. 770, 56 F.P.C. 509 (1976), which the Subcommittee on Oversight and Investigation of the House Committee on Interstate and Foreign Commerce had criticized for its failure to prevent such abuses.

collect the new gas rate for production from a new well or new completion within an established proration unit in the same reservoir; such rate filing shall be accompanied by a statement of eligibility which justifies the new well or new completion for reasons other than price.

56 F.P.C. at 2790–91.

Section 2.56a(p) provides:

Reporting requirements on new wells and completions. Where a producer intends to drill a new well or perform a new completion operation within an established proration unit in the same reservoir, the producer is required to file a rate filing to collect the base rate prescribed in paragraphs (a)(1) and (3) of this section, and such filing shall be accompanied by a statement of eligibility for the rates prescribed in paragraphs (a)(1) and (3) of this section, justifying the need for the drilling of the new well or the performance of the completion operation. With each filing the producer will include as part of his statement of eligibility (1) a statement of the producer relating to the need for the drilling of a new well or the performance of a completion operation and the date of such drilling or recompletion, (2) a statement of the producer relating to the date of the initial drilling or recompletion of the existing well, (3) copies of all documents filed with or issued by local or State regulatory agencies relating to the drilling of the new well or the performance of the completion operation, (4) a statement by the local or State regulatory agencies relating to the need for an additional well or completion operation into the subject reservoir, and (5) a statement by the buyer of the gas that the gas qualifies for the rates established in paragraphs (a)(1) and (3) of this section, or why the buyer believes it does not. The producer shall also furnish any additional material in its possession or available to it which the Commission may request in writing. Documents or other data previously filed with the Commission, whether by the producer or another, may be incorporated by reference in any filing hereunder.

## II

The proceeding below involved application of vintaging principles to a drilling method known as sidetracking. The Commission explained this drilling technique in *Imperial Oil Co.*, 58 F.P.C. 680, 685–86 n. 2 (1977).

[Sidetracking] is a secondary operation. After the hole has been drilled and casing has been set, it may become necessary, for various reasons, to drill a second hole in the vicinity of the initial hole. Rather than starting at the surface with a new hole and setting new casing strings all the way, it may be less expensive to utilize a portion of the casing in the original cased hole. To do this, a milling tool is used to grind out a "window" through the side of the casing at some selected depth. After this is done, a whipstock is utilized to direct a drilling bit out of the window at some desired angle into previously undrilled earth strata. From this directional start a new hole is drilled to the desired formation depth and casing is set in the new hole and tied back to the older casing.

A sidetracking operation thus results in a well that is partly old and partly new. Costs are incurred both when the well is initially drilled and later when the sidetracking operation occurs. An important question, and one left unresolved by Opinion 770–A, is whether the date of spudding or of sidetracking determines the vintage price applicable to gas produced from a sidetracked well.

In *Imperial Oil* the Commission for the first time addressed specifically application of vintaging to sidetracking operations. There the Commission outlined a general intention to treat sidetracking operations in the same manner as totally new wells.[5]

---

**5.** The Commission based this decision on a footnote in a prior order entitled "Order Requiring New Producer Filings," Docket No. RM75–14 (October 21, 1976), which provided that, for sidetracking operations, "the date of commencement of the new drilling operations

Like new wells, sidetracking operations automatically would merit a new vintage price under two circumstances: where the sidetracking was sanctioned by a Geological Survey permit; or, for wells under state jurisdiction, where the sidetracking resulted in a new completion outside the existing proration unit. 58 F.P.C. at 684. Also like new wells, an onshore sidetracking resulting in a new completion within an existing proration unit would have to be "substantiated by a rate filing pursuant to Section 2.56a(p) of the Regulations." *Id.*

The following year, in *Mullins & Prichard,* Docket No. CS73–36 (April 4, 1978), the Commission retracted its statement that an onshore sidetracking resulting in a new completion within an existing proration unit could qualify for a new vintage price by complying with 2.56a(p). The petitioner in *Mullins* proposed a sidetracking operation from a point on the original well bore at a depth of 14,177 feet to a new completion at 14,300 feet. The petitioner stated that the project would be financially feasible only if a new vintage price could be secured. The Commission denied relief because the proposed new completion was within the existing proration unit. It stated:

> [W]e will take this opportunity to set forth our views with respect to a statement made in *Imperial* regarding sidetracking and Section 2.56a(p) of the Commission's regulations. The Commission stated parenthetically in *Imperial*, "With regard to the 'whipstock' [sidetracking] operation proposed . . . , the applicability of the rates established in Opinion No. 770–A must be substantiated by a rate filing pursuant to Section 2.56a(p) of the regulations." Section 2.56a(p) provides that gas produced from a replacement well drilled on an established proration unit, or as a result of a new completion operation within an established proration unit, may qualify as new gas, provided

that the producer makes a rate filing accompanied by a statement justifying the need for the replacement well or the completion operation, and by other documents. *We do not believe that a sidetracking operation within an existing proration unit should be permitted to qualify for new gas rate treatment under § 2.56a(p). Producers undertaking sidetracking operations within the existing spacing or proration unit are able to utilize existing well footage to a great degree,* and therefore to permit these operations to qualify under § 2.56a(p) runs counter to the rationale of the section itself.

(Emphasis added.)

## III

The focus of this appeal is on the general rule established in *Mullins & Prichard.* The Commission relied primarily on this rule to deny Shell a new vintage price for wells sidetracked to new locations in existing proration units despite Shell's compliance with 2.56a(p). Shell challenges the rule here. Its primary complaint is that the rule was established in a factual context far different from that in this case. Unlike the *Mullins & Prichard* well, Shell's wells have been sidetracked from points only slightly below the surface.[6] They do not "utilize existing well footage to a great degree," the single factual premise underlying the *Mullins & Prichard* amendment to the Commission's sidetracking rule.

The Commission's defense of the *Mullins & Prichard* rule centers on its firmly established power to make rules of general application. *See generally* Permian Basin Area Rate Cases, 390 U.S. 747 (1968). According to the Commission, the factual distinction between this case and *Mullins & Prichard* is irrelevant. At most, the Commission asserts, Shell is a "high cost operator[ ] . . .

---

. . . shall determine the appropriate vintaging date . . . ."

**6.** The wells involved in this appeal are "onshore" in that they are within the jurisdiction of Louisiana. They are located near the Louisiana coast, however, and are drilled from "off-

shore" platforms. Sidetracking these wells, in contrast to drilling new ones, saves some start-up drilling costs and eliminates the environmental risk posed by drilling a new hole through the ocean floor.

more seriously affected . . . than others" by the rule. *Permian Basin,* 390 U.S. 747 at 769, 88 S.Ct. 1344 at 1361, 20 L.Ed.2d 312 (quoting *Bowles v. Willingham,* 321 U.S. 503, 518, 64 S.Ct. 641, 649, 88 L.Ed. 892 (1944)). The Commission's argument rests on the unassailable notion that an individual party should not be allowed to overturn a valid general rule simply because he can prove that his case presents the exception.

We do not disagree with these principles. The Commission certainly has the power to make bright-line rules of general application [7] and to apply them without regard to individual circumstance. This is the basic notion underlying vintaging. But it also goes without saying that Commission rules of general application must themselves be valid. And to be valid the facts upon which a rule is based must be supported by substantial evidence. 15 U.S.C. § 717r(b).

This is where the rule of *Mullins & Prichard* fails. The critical "fact" the Commission relied on to substantiate the rule is that "[p]roducers undertaking sidetracking operations within the existing spacing or proration unit are able to utilize existing well footage to a great degree . . . ." Yet the Commission has adduced no evidence, either here or in *Mullins & Prichard,* to show that this "fact" is indeed a fact.[8] This failure is particularly important because the general rule was announced in an individual adjudication without benefit of a rulemaking record and because it represents a departure from the prior rule announced in *Imperial.*

Our inquiry into administrative actions is limited. But an agency must at the very least provide support for critical facts underlying its decisions. *See NLRB v. Metropolitan Life Ins. Co.,* 380 U.S. 438, 442–43, 85 S.Ct. 1061, 1063–1064, 13 L.Ed.2d 951 (1965). Without this, judicial review of agency decisions is impossible. *Id.* Be-

cause the Commission has failed to substantiate the single factor upon which the rule of *Mullins & Prichard* is based, the order in the present case cannot stand.

### IV

The Commission asserts that Shell's argument is "nothing more than an effort to reargue a matter that has been considered and settled by the Commission on general policy grounds." According to the Commission, Shell should have intervened in *Mullins & Prichard* with the aim of seeking ultimate judicial resolution at that time. These comments reflect a view that Shell, by its failure to intervene in *Mullins & Prichard,* forfeited any opportunity to challenge the rule established in that case.

We reject this view. Agencies may establish rules of general application in a statutory rulemaking or an individual adjudication. The choice of methods is a matter within the agency's informed discretion. *NLRB v. Bell Aerospace Co.,* 416 U.S. 267 (1974). But we must be mindful that these two methods of making rules differ fundamentally in the due process safeguards they provide. Rulemaking procedures require public notice and an opportunity for all interested parties to participate. Anyone aggrieved by a rule established in a rulemaking must challenge it within the prescribed appeal period or forever hold his peace. By contrast, no due process guarantees are extended to non-parties in an individual adjudication, although non-parties may be greatly affected by a general rule an agency adopts in such a proceeding. Shell was afforded no meaningful opportunity in *Mullins & Prichard* to challenge the factual assumption that "[p]roducers undertaking sidetracking operations within the existing spacing or proration unit are able to utilize existing well footage to great degree . . . ." Due process requires that

---

7. The Supreme Court's decision in *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), makes clear that an agency's power to make general rules may be carried out in an adjudicatory setting.

8. At oral argument Commission counsel admitted that there was no record support in *Mullins & Prichard* for the factual premise upon which the rule established in that case is based.

**236**

Shell be allowed to challenge that assumption here and now.

*Bell Aerospace* makes clear that an agency may establish a general rule in an individual adjudication. But neither that decision nor any other precludes a later challenge to the validity of the rule by one who was not a party to the proceeding in which it was announced.

### V

The general rule established in *Mullins & Prichard* and applied in this case rests on an assumption the Commission has failed to support by substantial evidence. We therefore GRANT Shell's petition for review, VACATE the portion of the order appealed from, and REMAND for further proceedings consistent with this opinion.[9]

---

**9.** Our decision of course does not preclude the Commission from establishing the identical rule on remand if it adduces sufficient evidence to support the underlying assumption.