PLACID OIL COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

No. 88–4349.

United States Court of Appeals, Fifth Circuit.

June 16, 1989.

Hanford O'Hara, Jerome Feit, Sol., FERC, Washington, D.C., for respondent.

Frank P. Saponaro, Jr., Morgan, Lewis & Bockius, Washington, D.C., for petitioner.

Before CLARK, Chief Judge, BROWN and JOHNSON, Circuit Judges.

PER CURIAM:

The Federal Energy Regulatory Commission (FERC) issued an order requiring Placid Oil Company (Placid) to make refunds to a pipeline customer on the grounds that Placid had charged in excess of the maximum lawful price for the sale of certain natural gas. On petition for review of that order, we affirm in part and vacate in part.

## I.

Placid has a 50% interest in an onshore natural gas well located in Louisiana. The drilling of the well began on September 30, 1972. By December 20, 1972, the well had been drilled to a depth of 18,912 feet. A drilling tool lodged in the hole at this depth, and "fishing" operations to remove the tool took place from December 20, 1972 to January 11, 1973. The fishing operations were unsuccessful. In order to reach the desired depth it became necessary to get around the tool. A secondary drilling operation was commenced on January 17, 1973. It utilized the existing well bore to a depth of 17,237 feet. At that point the well was angled past the blockage and completed to a depth of 17,850 feet which resulted in the production of a total of 265,295 Mcf of natural gas from the "Z–2" sand at the 17,569–17,650 foot level. Placid did not take its 50% share of this gas because its pipeline purchaser, Tennessee Gas Pipeline Company (Tennessee Gas), had not yet made a connection to the well. Instead, Placid retained a right to take its share from other production at a later date.

In January 1977 the well was "recompleted" in the original well bore between 17,-169 and 17,180 feet. The hole below was sealed off at 17,194 feet. All of this activity was above the point of departure for the secondary drilling located at a depth of 17,237 feet. The recompletion resulted in the production of a total of 8,489,345 Mcf of natural gas from the "Lower X" sand at the 17,169–180 foot level.

Tennessee Gas connected its pipeline to the well in May 1977. Placid took its 50% share of the production from the Lower X sand, plus an additional 132,648 Mcf attributable to Placid's share in the production from the Z–2 sand, for a total of 4,373,676 Mcf of gas. Placid sold this gas to Tennessee Gas based on the 1973–74 biennium rate of 93 cents per Mcf established in Opinion No. 770, 56 F.P.C. 509, *modified*, Opinion No. 770–A, 56 F.P.C. 2698 (1976); *aff'd, American Public Gas Ass'n v. Federal Power Comm'n*, 567 F.2d 1016 (D.C. Cir.1977), *cert. denied*, 435 U.S. 907, 98 S.Ct. 1456, 1457, 55 L.Ed.2d 499 (1978).

FERC found that all gas sold by Placid was only entitled to the recompletion rate of 52 cents per Mcf provided in 18 C.F.R. § 2.56a(a)(5) (1988), and issued an order directing Placid to refund the overcharges to Tennessee Gas. Placid Oil Co., 37 F.E.R.C. ¶ 61,248 (1986). FERC denied Placid's request to waive the refund on equitable grounds, and denied rehearing. Placid petitions for review of FERC's order.

## II.

Under the Natural Gas Act FERC has the duty to fix just and reasonable rates for sales in interstate commerce of natural gas for resale. *See* 15 U.S.C. §§ 717d(a), 717(b). Pursuant to this duty, FERC has established a cost-based vintage system to set prices for natural gas. The vintage price is based on the average cost of gas production during a particular period. Under this vintage system the date the drilling of a natural gas well begins (the spud date) is normally the basis for determining the price of gas produced from that well. *See Shell Oil Co. v. FERC*, 707 F.2d 230, 232 (5th Cir.1983). Gas produced from a recompletion of a well is generally entitled to the price governed by the spud date. *See* Imperial Oil Co., 58 F.P.C. 680, 685 (1977); Opinion No. 770–A, 56 F.P.C. at 2792. Gas produced from a secondary or "sidetrack" operation, however, may be entitled to the price applicable at the time the sidetrack operation is commenced. *Shell Oil*, 707 F.2d 230, *on remand*, 24 F.E.R.C. ¶ 61,359 (1983). Producers desiring a higher vintage rate for gas produced from onshore sidetrack operations in the vicinity of the initial well must make a rate filing pursuant to 18 C.F.R. § 2.56a(p) and justify

the need for the sidetrack operation. 24 F.E.R.C. ¶ 61,359.

*The 1973 Secondary Drilling*

■ FERC found that the gas attributable to the Z–2 sand production did not qualify for the 1973–74 biennium rate because the secondary drilling in January 1973 did not meet the definition of "sidetracking." FERC explained the sidetracking technique in Imperial Oil Co., 58 F.P.C. 680, 685 n. 7 (1977):

[Sidetracking] is a secondary operation. After the hole has been drilled and casing has been set, it may become necessary, for various reasons, to drill a second hole in the vicinity of the initial hole. Rather than starting at the surface with a new hole and setting new casing strings all the way, it may be less expensive to utilize a portion of the casing in the original cased hole. To do this, a milling tool is used to grind out a "window" through the side of the casing at some selected depth. After this is done, a whipstock is utilized to direct a drilling bit out of the window at some desired angle into previously undrilled earth strata. From this directional start a new hole is drilled to the desired formation depth and casing is set in the new hole and tied back to the older casing.

The 1973 secondary drilling involved here falls within *Imperial*'s definition of sidetracking. The initial drilling had stopped for more than three weeks while fishing operations were performed to remove lodged tools. Because the fishing operations were unsuccessful it became impossible to use the well to reach the desired depth. Rather than begin drilling a new well at the surface, part of the existing well was used with directional drilling to reach the depth intended. A portion of the original casing in the well bore was removed and new casing and tubing were put in to accommodate the secondary drilling. The secondary well left the original bore at 17,237 feet, almost 1700 feet above where the tools were stuck. The cost of the secondary drilling was $320,618. This operation is clearly within FERC's definition of sidetracking set forth in *Imperial Oil.* It is also encompassed by a statement we made in commenting on the *Imperial Oil* definition: "A sidetracking operation thus results in a well that is partly old and partly new. Costs are incurred both when the well is initially drilled and later when the sidetracking operation occurs." *Shell Oil,* 707 F.2d at 233. Indeed, in its order in Placid's case FERC repeatedly referred to the 1973 secondary drilling as a sidetracking. However, FERC went on to add several requirements and create a new "technical" definition of sidetracking:

The drilling operations that commenced on January 17, 1973, were of course, a sidetracking from the original well bore, but do not constitute sidetracking in the technical sense. The drilling was merely a continuation of the initial drilling operations to get around the tools that had lodged in the well bore. The so-called "sidetracking drilling" did not occur after permanent cessation of the original drilling operation and removal of the drilling equipment. No dry hole report was filed with any governmental authority. The sidetracking drilling was commenced immediately after fishing operations proved unavailing and the sidetracking became necessary to prevent abandonment of the well bore. Accordingly, the completion in the Z–2 sand is the initial completion in the well bore, and is entitled to only the flowing gas rate.

37 F.E.R.C. ¶ 61,248.

FERC must either conform to its prior precedent or explain its reasoning for departure from that precedent. *Laclede Gas Co. v. FERC,* 722 F.2d 272, 275 (5th Cir. 1984). In this case FERC has departed from the definition of sidetracking set forth in *Imperial Oil* by adding several new requirements: permanent cessation of drilling, removal of the drilling equipment, or the filing of a dry hole report. However, FERC has not offered any reason why "sidetracking" requires these new elements. Nor has FERC cited any authority mandating these factors to bring a secondary drilling operation within the definition of sidetracking. Indeed, FERC did not refer to the sidetracking definition it set forth in *Imperial Oil.*

If there were any need to change the definition of sidetracking it would be to curb abuse of the vintage price system through the drilling of a secondary well solely to get a higher gas rate. However, no opportunity for such abuse is present here. The 1973 secondary drilling was undertaken at substantial expense and risk in an attempt to achieve a well completion that would not otherwise occur unless the operator incurred the unnecessary additional expense of drilling a new well from the surface. Potential abuse of the vintage system through sidetracking operations is further cabined by the requirement of a rate filing and justification for the sidetracking operation under 18 C.F.R. § 2.56a(p). The fact that there was no substantial interruption in the drilling process and no dry hole report would neither add deterrence nor furnish any justification for the denial of the sidetracking classification when the secondary drilling is necessary to prevent abandonment of the well bore.

FERC has inexplicably departed from the definition of sidetracking set forth in *Imperial Oil.* Its unjustified ruling cannot stand.

Because FERC found that the 1973 secondary drilling did not amount to a sidetracking, FERC did not determine whether Placid's rate filing under 18 C.F.R. § 2.56a(p) justified the 1973–74 biennium rate. FERC also did not determine whether the gas produced from the Lower X sand can be attributed to the Z–2 sand for the purpose of qualifying for the 1973–74 biennium rate. FERC should consider these issues on remand.

*The 1977 Recompletion*

█ Placid argues that the gas produced from the 1977 recompletion in "Lower X" sand is entitled to the 1973–74 biennium rate of 93 cents per Mcf. Placid acknowledges that the general rule under the vintage pricing system is that gas from recompletions is entitled to the rate governed by the original spud date rather than the recompletion date. Imperial Oil Co., 58 F.P. C. 680, 685 (1977); Opinion No. 770–A, 56 F.P.C. 2698. The rationale of this rule is that the bulk of well costs is incurred during the initial drilling rather than during the later recompletion. Opinion No. 770–A, 56 F.P.C. at 2792.

Placid asserts that the basis for the rule does not apply to this case because substantial costs were incurred after the original drilling in 1972. However, out of the total well cost of $1,576,075 Placid could attribute only $200,000 to the 1977 recompletion. The bulk of the total well costs, including $458,110 in drilling costs and $370,946 in lease costs, were incurred prior to 1973.

The recompletion in 1977 was accomplished by perforating the side wall of an existing well. Under the bulk-of-costs rationale previously established by FERC the original spud date should control. FERC's decision to deny the 1973–74 biennium rate to gas produced from the 1977 recompletion is neither arbitrary nor capricious. *See Transwestern Pipeline Co. v. FERC,* 820 F.2d 733 (1987), *cert. denied,* — U.S. ——, 108 S.Ct. 696, 98 L.Ed.2d 648 (1988).

As to the appropriate gas rate, FERC's opinion contains the following passage and footnote:

The drilling operation in 1973 in the Z–2 Sand did not constitute sidetracking but was the first production of the well. Thus the production from the Lower X Sand is eligible for the recompletion rate.[23]

> [23] If we had found that the drilling in January 1973 constituted sidetracking, the completion in the Lower X Sand in 1977 would then become the first completion in a well bore spudded prior to 1973, and the gas therefrom would be entitled to only the flowing gas rate in accordance with the *Imperial Oil Company* order, and not the higher recompletion rate.

37 F.E.R.C. ¶ 61,248.

The dicta in footnote 23 is incorrect. The fact that the 1973 secondary drilling constituted a sidetracking does not make the 1977 completion in the Lower X sand the first completion in the well. The sidetracking operation resulted in a 1973 completion and production in the Z–2 sand. Every cubic foot of the gas produced from the Z–2 sand flowed up the well bore past the

point from which gas in the Lower X sand was eventually produced. *Imperial Oil* does not stand for the proposition that a 1977 completion in a well spudded prior to January 1, 1973 is entitled to only the flowing gas rate. Indeed, *Imperial Oil* quotes FERC's regulation at 18 C.F.R. § 2.56a(a)(5), which now reads as follows:

Sales of ... gas ... may be made at a rate of 52 cents ... provided the sale is made pursuant to ... (iii) a completion operation into a different formerly nonproductive reservoir commenced on or after January 1, 1973, in a well commenced (spudded) prior to January 1, 1973.

See *Imperial Oil*, 58 F.P.C. 680, 682 n. 3 (quoting substantially similar 1977 version of 18 C.F.R. § 2.56a(a)(5)). In accordance with FERC's regulation, the gas produced from the 1977 recompletion in the Lower X sand is entitled to the recompletion rate of 52 cents per Mcf even though the 1973 secondary drilling constituted a sidetracking.

*Waiver of the Refund*

FERC's order requires Placid to refund all overcharges to Tennessee Gas. Placid argues that FERC should have used its equitable powers to waive the refund requirement. Placid's argument is based on the claim that Placid will suffer a net loss of $664,749 on the well if it is required to make the refund, and that FERC failed to adequately consider its duty to permit producers to recover their costs and a reasonable return on investment.

Judicial review of an agency's denial of a waiver application is tightly contained. *United Gas Pipe Line Co. v. FERC*, 707 F.2d 1507, 1511 (D.C.Cir.1983). The denial will be reversed only if the agency abused its discretion or acted arbitrarily by failing to give meaningful consideration to the application. *Id.*

We cannot say that FERC did not give meaningful consideration to Placid's request for a waiver. FERC appropriately noted that the vintage pricing system does not guarantee individual producers a recovery of costs and a reasonable return. Rather, it is an averaging system which is designed to ensure continued drilling and

which satisfies the statutory duty to determine "just and reasonable" rates. *See Shell Oil*, 707 F.2d at 232.

Furthermore, Placid's claimed loss of $664,749 is based on the inclusion of interest on the overcharges to be refunded. Interest should be excluded from the computation since Placid had the use of the excess charges from the time of collection. Excluding interest, FERC concluded that Placid's adjusted net return from the well is $1,357,915 after the refund. FERC's refusal to waive the refund is neither arbitrary, capricious, nor an abuse of discretion.

III.

FERC's ruling that gas produced from the Lower X sand as a result of the 1977 recompletion is entitled to the recompletion rate of 52 cents per Mcf is affirmed. FERC's refusal to waive the refund is also affirmed. FERC's finding that the January 1973 secondary drilling operation did not amount to a sidetracking is vacated. The case is remanded for further proceedings consistent with this opinion.

AFFIRMED in part; VACATED in part; and REMANDED.