# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-516

**PETROQUEST ENERGY, LLC**

**VERSUS**

**SAM L. BANKS, ET AL.**

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 99088
HONORABLE EDWARD D. RUBIN, DISTRICT JUDGE

**********

**MARC T. AMY**
**JUDGE**

**********

Court composed of Marc T. Amy, Elizabeth A. Pickett, and John E. Conery, Judges.

**EXCEPTION OF NO RIGHT OF ACTION DENIED.  PARTIAL SUMMARY JUDGMENT REVERSED.  REMANDED.**

**Larry Charles Hebert**
**Ottinger Hebert, L.L.C.**
**Post Office Drawer 52606**
**Lafayette, LA   70505-2606**
**(337) 232-2606**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     Isadore Delcambre Estate

**Charles R. Sonnier**
**The Sonnier Firm**
**Post Office Drawer 700**
**Abbeville, LA   70511-0700**
**(337) 893-5973**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     Sam L. Banks

**Brendan P. Doherty**
**Gieger, Laborde & Laperouse**
**701 Poydras, Suite 4800**
**New Orleans, LA 70139-4800**
**(504) 561-0400**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Sam L. Banks**

**Karen D. Ancelet**
**Onebane Law Firm, APC**
**Post Office Box 3507**
**Lafayette, LA 70502-3507**
**(337) 266-1232**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
**Petroquest Energy, LLC**

**AMY, Judge.**

This concursus proceeding questions the appropriate royalty to be paid a mineral lessor from a well operated by the plaintiff in the concursus. Both the lessor and an overriding royalty interest owner were named as defendants. The parties filed cross motions for summary judgment seeking a determination of the appropriate royalty due from the well in light of an amendment to the original lease. The trial court entered partial summary judgment in favor of the overriding royalty interest holder. The lessor appeals. For the following reasons, we reverse the entry of partial summary judgment, and remand for further proceedings. We further deny the lessor's exception of no right of action, filed for the first time on appeal.

### Factual and Procedural Background

PetroQuest Energy, LLC instituted this matter by Concursus Petition in August 2014, naming Sam L. Banks and the Isadore Delcambre Estate as defendants in the proceeding. As the operator of several wells located on the Estate's property in Vermilion Parish, PetroQuest sought the concursus proceeding after Mr. Banks, the owner of an overriding royalty interest (ORRI) in certain wells, challenged the royalty due the Estate from production from a particular well, Broussard Est. No. 1 ALT Well[1] (the alternate well).

In setting forth the background of the alternate well, the petition noted that the Estate entered into an Oil, Gas, and Mineral Lease with Yuma Exploration and Production Company in August 2005. The record establishes that, in 2007, Yuma assigned its interest in the lease, with a reservation of an ORRI, to PetroQuest. In

---

[1] The well name is reported variously through the record and supporting documentation. In this instance, we use the title included within the petition, "Broussard Est. No. 1 ALT Well."

that same year, drilling began on the original well at interest in this matter, Broussard No. 1 (the original well).

However, by January 15, 2008 letter, PetroQuest noted that it had drilled the original well "to a depth of 15,253′ MD (15,219′ TVD) Sidetrack[2] hole #1 and encountered 'Gulf Coast Conditions[,]' as defined in the [Participating] Agreement[3] that renders further drilling impractical." PetroQuest recommended that it "plug the open hole and temporarily abandon the Well leaving the Well in a condition that the Participants can either re-enter the Well for sidetracking or permanently plug and abandon the Well at a later date without the use of a drilling rig." The record includes the resulting Office of Conservation Plug and Abandon Report, which indicates that the well was "temporarily abandoned" at that time.

In April 2008, PetroQuest and the Estate entered into an "Amendment of Oil, Gas and Mineral Lease" to the original, 2005 lease, extending the lease term and modifying the royalty rate due the Estate. The focus of this proceeding is the Amendment's provision that provided for an increased royalty rate of 23%, particularly as it relates to a royalty payable for "Subsequent Wells[.]" The Amendment provides, in pertinent part:

> "(iii)  Lessor and Lessee acknowledge that PetroQuest Energy, L.L.C. has first drilled the PetroQuest Energy-CRIS R RA SUA; A.

---

[2] This operation appears within the record as both "side tracking" and "sidetracking."

[3] Although the Participating Agreement is not contained within the record, counsel for Mr. Banks explained at the hearing before the trial court as follows regarding the unsuccessful drilling of the original well:

> [I]n the course of that 2007-2008, they drilled the Broussard Number One well. They drill it to fifteen thousand (15,000) feet plus or minus a few feet, twenty-six million dollars ($26,000,000) plus or minus a few dollars here or there that it costs to drill this well down to that depth. And then they hit junk in the hole, what they call Gulf Coast Conditions and they realized we're gonna have to go around that junk to complete the well. So, what they did - - because they need to either be drilling or producing on that property, they said, we will come back to that well later.

> Broussard Estate No.1 Well, Conservation Well Serial No. 235876, Bayou Hebert Field, on lands unitized with the lands covered by this lease, which well was not successfully completed, and PetroQuest Energy, L.L.C. has proposed the drilling of a second well either on the lands covered by this lease or on lands unitized therewith (the "Second Well"). Notwithstanding the provisions of sub-paragraphs (h)(i) and (h)(ii) of this lease, Lessor and Lessee agree that for any well drilled on lands covered by this lease or on lands unitized therewith after the drilling of the Second Well ("Subsequent Wells"), royalty payable under this lease on production from Subsequent Wells shall increase to Twenty-three (23.00%) percent, but shall otherwise be calculated in accordance with the applicable provisions of this lease."
>
> It is expressly understood that by this amendment, royalty to be paid by Lessee on production from the Second Well is increased to Twenty-two and One-half (22.50%) percent, and royalty on production from Subsequent Wells is increased to Twenty-three (23.00%) percent.

Mr. Banks, Yuma's Chief Executive Officer, subsequently acquired his interest in this matter in March 2011 when Yuma executed an "Assignment of Overriding Royalty Interest" in his favor. The assignment conveyed a 1.090268% ORRI in the original, 2005 lease.

Following the 2008 Amendment, PetroQuest continued drilling operations on the subject property, including the drilling of Thibodeaux No. 1. The parties do not dispute that Thibodeaux No. 1 constituted the "Second Well" contemplated by the 2008 amendment and, thus, the 22.50% royalty payment attributable to that well is not now at issue. Nor do the parties dispute that Broussard No. 2 was a "Subsequent Well" pursuant to the amendment and, therefore, subject to the 23% royalty payment.

Rather, the increased royalty rate became an issue when, in 2012, PetroQuest proposed reentry of the original well to the well's participants as follows: "PetroQuest hereby proposes reentering the PetroQuest – Broussard #1

3

(SN 235876) sidetracking out and drilling the CRIS R RA SUA; Broussard #1 ST Alternate Well . . . ." The proposal included a request for authority for an expenditure "for the Well in the amount of $7,427,800.00 (the "AFE")" as well as a request for remittance of the requisite "cash call amount[.]"

PetroQuest alleged in the concursus petition that it began drilling the alternate well "on or about January 10, 2013 by utilizing the upper portion of original wellbore of the A. Broussard Est. No. 1 Well that was previously drilled as a dry hole." It noted that the "Broussard Est. No. 1 ALT Well was completed as a gas well on May 25, 2013."

PetroQuest indicated in the petition that, per the 2008 Amendment, it "treated the Broussard Est. No. 1 ALT Well as a 'Subsequent Well' and has paid royalties to Isadore Delcambre Estate for production from this unit well at the royalty rate of Twenty-three (23%) percent." However, by July 2014 correspondence to PetroQuest, Mr. Banks alleged that it improperly classified this alternate well as a Subsequent Well under the terms of the Amendment. He asserted that the alternate well was instead a continuation of the original well, Broussard No. 1, and that it therefore constituted the first well under the terms of the Amendment. Mr. Banks thus alleged that the proper royalty payment to the Estate was 22.50% and that PetroQuest had improperly reduced his ORRI payments by improperly categorizing that well. PetroQuest noted that Mr. Banks sent a "Notice Pursuant to La.R.S. 31:212.21 of Failure to Make Royalty Payment" in that regard. Mr. Banks demanded that PetroQuest pay him the sums he alleged were due, as well as legal interest.

In light of Mr. Banks' demand and the assertion that the lesser royalty was due the Estate, PetroQuest alleged in its concursus petition that it could not

4

"continue to pay royalties on this unit well to lessor, Isadore Delcambre Estate, without possibly incurring liability to Sam L. Banks." Therefore, PetroQuest sought placement of the disputed funds into the registry of the court so that the defendants could assert their respective claims contradictorily. PetroQuest further sought a declaration from the trial court as to PetroQuest's obligations "to the Defendants for payment of royalties under the Amendment of Lease and Assignment of Overriding Royalty and all other agreements at issue" as well as a judgment relieving it from further liability to the defendants for the subject funds.

Along with his answer to the concursus petition, Mr. Banks filed a reconventional demand and cross-claim. He noted that the Louisiana Office of Conservation assigned the original well the serial number of 235876, that PetroQuest's correspondence proposed reentry into serial number 235876, and that upon completion, the alternate well continued to bear serial number 235876. Mr. Banks alleged that, despite his notice to PetroQuest regarding the dispute as to the ".5% royalty, PetroQuest began, effective the first date of production, to pay all of the royalty relating to the disputed interest" to the Estate. Mr. Banks sought a declaration of PetroQuest's purported obligation "to pay the full overriding royalty interest set forth in the ORRI Assignment to Banks from the date of first production of the Conservation Well Serial No. 235876, awarding all sums in the registry of the Court to Banks[.]" Mr. Banks sought costs as well as double damages, legal interest, and attorney fees pursuant to La.R.S. 31:212.23.[4]

---

[4] Louisiana Revised Statutes 31:212.23, entitled "Effects of payment or nonpayment with or without stating reasonable cause therefor; division order[,]" provides:

> A. If the obligor pays the royalties or production payments due plus the legal interest applicable from the date payment was due, the owner shall have no further claim with respect to those payments.

5

Thereafter, all parties filed motions for partial summary judgment, with the Estate and PetroQuest filing a joint motion in that regard. Among the exhibits introduced in support of, and in opposition to, the motions for partial summary judgment, the parties attached the subject lease, amendment(s), correspondence regarding the history of the original and alternate wells, documentation from the Office of Conservation as to drilling/abandonment activity, and excerpts of publications providing definitions of disputed terminology. Following a hearing, the trial court ruled in favor of Mr. Banks, stating only that the alternate well "was not a subsequent well." The trial court noted that the serial number on the well had not changed from the original well to the alternate well, a point advanced by Mr. Banks. The trial court explained that issues of "[a]ttorney fees and other punitive measures" would be relegated to trial on the merits.

By an August 31, 2015 judgment, the trial court commemorated the granting of Mr. Banks' motion for partial summary judgment and the corresponding denial of that filed by PetroQuest and the Estate. Mr. Banks thereafter filed a partial motion to dismiss, dismissing his claim against PetroQuest for penalties pursuant to La.R.S. 31:212.23 and reserving his right to pursue future claims.

Thereafter, the partial summary judgment was reduced to "Final Judgment" for appeal purposes.[5] The ruling provided that: "the well at issue in this litigation,

---

B. If the obligor fails to pay within the thirty days from notice but states a reasonable cause for nonpayment, then damages shall be limited to legal interest on the amounts due from the date due.

C. If the obligor fails to pay and fails to state a reasonable cause for failure to pay in response to the notice, the court may award as damages double the amount due, legal interest on that sum from the date due, and a reasonable attorney's fee regardless of the cause for the original failure to pay.

[5] Both the final judgment as well as the subsequent order of appeal were signed by a judge pro tempore.

identified solely for the purposes of this judgment as Louisiana Permit Serial Number 235876, is the 'first drilled' well and not a 'Subsequent Well' pursuant to the April 15, 2008 Amendment of Oil, Gas and Mineral Lease[.]" It further declared "the royalty amount payable" to the Estate on the alternate well "is 22.5% from the date of first production, and not 23%[.]" Remaining claims of the parties asserted in the litigation were "dismissed with prejudice[,]" and each party was cast with its own costs and attorney fees.

The Estate appeals, including both judgments in its motion for appeal and identifying the following as issues for review:

[1.] Is the Amendment clear and explicit in its definition of what constitutes a "Subsequent Well?"

[2.] Does the evidence admitted at the District Court prove that the Alternate Well is a "Subsequent Well" under that definition?

[3.] Is evidence of the ministerial procedures of assignment of serial numbers to wells by the Office of Conservation, State of Louisiana, itself not a party to the Amendment, probative of the common intent of the parties to the Amendment?

[4.] Does the evidence admitted at the District Court raise any genuine issue of material fact?

[5.] Is the Delcambre Family entitled to judgment as a matter of law?

The Estate has also filed an exception of no right of action for the first time in this court.[6]

---

[6] Louisiana Code of Civil Procedure Article 2163 provides, in part, that: "The appellate court may consider the peremptory exception filed for the first time in that court, if pleaded prior to a submission of the case for a decision, and if proof of the ground of the exception appears of record." *See also* La.Code Civ.P. art. 927(B) (providing that "The nonjoinder of a party, perempton, res judicata, the failure to disclose a cause of action or a right or interest in the plaintiff to institute the suit, or discharge in bankruptcy, may be noticed by either the trial or appellate court on its own motion.").

Discussion

*Exception of No Right of Action*

By this pleading, the Estate observes that Mr. Banks was not a party to the Amendment. Rather, only the Estate and PetroQuest were parties to the 2008 document. Thus, the Estate contends, Mr. Banks has no right to seek an interpretation of the Amendment contrary to the common intent of the parties, particularly in a manner that would be detrimental to the Estate. The Estate suggests instead that by the Assignment providing his ORRI, Mr. Banks agreed that the conveyance could be reduced by future reduction in the assignor's (Yuma's) interest.[7] And, as anticipated by the Assignment, the Amendment did, in fact, reduce that interest. Furthermore, to the extent that Mr. Banks suggests that he relied upon the public records of Vermilion Parish in arriving at his definition of a "Subsequent Well," the Estate notes that the Amendment itself was not recorded. Rather, the Estate observes that only a "Notice of Amendment of Oil, Gas and Mineral Lease," was filed. As the Notice "does not contain any of the language concerning escalation of lessor royalty[,]" the Estate argues that Mr. Banks

---

[7] The pertinent portion of the March 1, 2011 "Assignment of Overriding Royalty Interest" provides:

> The overriding royalty interest hereby conveyed is based upon the assumption that each of Said Leases covers the full and undivided fee simple mineral interest in the lands therein described. In the event that any of Said Leases covers less than the full and undivided fee simple interest in the oil, gas and other minerals in and under the lands covered thereby, then the overriding royalty interest hereby conveyed with respect to such of Said Leases as are so affected shall be reduced proportionally. *Furthermore, in the event that Assignor's interest in any of Said Leases is subject to reduction upon the occurrence of some future event under the terms and provisions of any contract, agreement or other instrument, recorded or unrecorded, to which Assignor's interest in any of Said Leases is subject, then the overriding royalty interest hereby conveyed with respect to such of Said Leases as are so affected shall likewise be reduced proportionately.*

(Emphasis added.)

argument that he is entitled to rely on the public records is misplaced. Instead, his ORRI was reduced by a contract to which he was not a party.

Louisiana Code of Civil Procedure Article 681 explains that: "Except as otherwise provided by law, an action can be brought only by a person having a real and actual interest which he asserts." The exception of no right of action, provided by La.Code Civ.P. art. 927(A)(6), permits a defendant to challenge whether the plaintiff has such a real or actual interest in the suit and to question whether that plaintiff belongs to the class of persons to whom the law affords the cause of action asserted in the suit. *Eagle Pipe and Supply, Inc. v. Amerada Hess Corp.*, 10-2267 (La. 10/25/11), 79 So.3d 246.

By this exception, the Estate relies upon the seemingly straightforward observation that Mr. Banks is not a party to the Amendment and thus, per that argument, does not have an interest in the intent of the true parties to that contract. Recall, however, that the instant claims are presented within the confines of a concursus proceeding. Louisiana Code of Civil Procedure Article 4651 explains that this special proceeding "is one in which two or more persons having competing or conflicting claims to money, property, or mortgages or privileges on property are impleaded and required to assert their respective claims contradictorily against all other parties to the proceeding." Those with such claims "may be impleaded in a concursus proceeding even though the person against whom the claims are asserted denies liability in whole or in part to any or all of the claimants, and whether or not their claims, or the titles on which the claims depend, have a common origin, or are identical or independent of each other." La.Code Civ.P. art. 4652. The remedy of the concursus proceeding may be used to prevent both multiple liability and multiple litigation. *Cimarex Energy Co. v.*

9

*Mauboules*, 09-1170 (La. 4/9/10), 40 So.3d 931. Thus, the procedure "can be used by a person against whom multiple claims are asserted, even though liability on some or even all of the claims is denied." *Id.* at 940.

Critically, in review of this exception of no right of action, we are mindful that La.Code Civ.P. art. 4656 provides that:

> Each defendant in a concursus proceeding is considered as being both a plaintiff and a defendant with respect to all other parties. *No exceptions or responsive pleadings may be filed to the answer of a defendant, and every fact alleged therein is considered as denied or avoided by effect of law as to all other parties.*

(Emphasis added.) This matter was instituted by PetroQuest, which named both Mr. Banks and the Estate as defendants. As provided by Article 4656, the parties participate in the concursus as both plaintiff and defendant. By his answer, Mr. Banks disputed many of the facts alleged in the concursus petition, including those relating to the signatories' intent in entering into the Amendment and whether the alternate well was treated as a "Subsequent Well" per the Amendment. He advanced further facts in support of his claim to the funds through a cross-claim, included within the Answer. The Estate may not now assert, by an exception or other responsive pleading, that he has no right to advance his claim to the concursus funds. La.Code Civ.P. art. 4656.

Rather, each party's "right" to the deposited funds is, in fact, the focus of the concursus proceeding. Notably, per its petition, even PetroQuest seeks a judgment "declaring the obligations of Plaintiff to the Defendants for payment of royalties under the *Amendment of Lease* and *Assignment of Overriding Royalty* and all other agreements at issue[.]" (Emphasis added.) Thus, the issue before the court is obviously entitlement to the disputed proceeds therein. The defendants' ability to establish that the Amendment is effective (or ineffective) to their respective claims

10

goes to the merits of the proceedings, as do questions raised by Mr. Banks regarding his reliance on the public records pertaining to the property. *See, e.g., Hibernia Nat'l Bank v. Orleans Reg. Hosp., L.L.C.*, 28,982 (La.App. 2 Cir. 11/1/96), 682 So.2d 1291 (wherein the second circuit considered the appropriate venue for a concursus proceeding pursuant to La.Code Civ.P. art. 4653(B), but specifically refrained from considering the parties' documentation upon a finding that those issues related to the merits of the concursus proceeding[8]), *writ denied*, 97-0026 (La. 2/21/97), 688 So.2d 513.

For this reason, we deny the exception of no right of action and turn to consideration of the Estate's appeal.

*Summary Judgment*

As seen in its exception of no right of action, the Estate argues, in part, that the trial court erred in granting summary judgment in favor of Mr. Banks as it allowed a third party to seek an interpretation of the Amendment contrary to that of the parties. The Estate argues that if the Civil Code's framework for interpretation of a contract is applied in this case, it is clear that the alternate well constituted a Subsequent Well per the Amendment. It further suggests that the trial court erred in accepting Mr. Banks' argument that the Office of Conservation's continued use of the well serial number for both the original well and the alternative well was a

---

[8] The second circuit explained that:

> Whether Tenant [a defendant in concursus] is the proper party to claim the proceeds of the letter of credit, whether the letter of credit is valid, whether the sublease is valid, and whether there has been a breach of the sublease or other agreements concerning the sublease are all issues which go to merits of this concursus proceeding.

*Hibernia*, 682 So.2d at 1296.

determinative factor in resolution of whether the alternative well was a Subsequent Well per the Amendment.

In its prayer, and in addition to its assertion that the matter should first be resolved through its exception of no right of action, the Estate seeks reversal of the summary judgment below and entry of summary judgment in its favor upon a finding that the Amendment is "clear and explicit" in its definition of "Subsequent Well." Alternatively, the Estate requests that the trial court's ruling be reversed and the case remanded for further proceedings upon a finding by the panel that "the contract at issue [is] ambiguous" or that the trial court made impermissible factual determinations in deciding the cross motions.

Louisiana Code of Civil Procedure Article 966(A)(2)[9] provides that: "[t]he summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by Article 969. The procedure is favored and shall be construed to accomplish these ends." Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, admitted for purposes of the motion for summary judgment, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B)(2). Importantly, "[a] fact is material if it potentially ensures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute." *Jackson v. City of New Orleans*, 12-

---

[9] Louisiana Code of Civil Procedure Article 966 was amended by 2015 La. Acts No. 422, § 1. However, its provisions became effective on January 1, 2016, after the parties filed their respective motions for summary judgment. We thus consider this matter under the version of the Article in effect at that time. *See* 2015 La. Acts No. 422, § 2 ("The provisions of this Act shall not apply to any motion for summary judgment pending adjudication or appeal on the effective date of this Act.").

2742, p. 5 (La. 1/28/14), 144 So.3d 876, 882, *cert. denied*, _ U.S. _, 135 S.Ct. 197 (2014). A "genuine issue of material fact is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate." *Id.* at 5-6 (citing *Smitko v. Gulf South Shrimp, Inc.*, 11-2566 (La. 7/2/12), 94 So.3d 750).

The moving party bears the burden of proof on the motion for summary judgment. La.Code Civ.P. art. 966(C)(2). However, if the moving party will not bear the burden of proof at trial on the issue presented, the moving party is not required "to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense." *Id.* An appellate court considers a motion for summary judgment de novo, using the same criteria that governed the trial court's determination as to whether summary judgment is appropriate. *Reynolds v. Bordelon*, 14-2371 (La. 6/30/15), 172 So.3d 607.

As this matter is subject to a de novo review and is not deferential in nature, we do not separately discuss the Estate's arguments regarding the trial court's particular factual findings. We instead consider whether either party established, by their cross motions for partial summary judgment, that no genuine issues of material fact remain as to the critical issue in this case, i.e., whether the alternate well constitutes a "Subsequent Well" pursuant to the terms of the 2008 Amendment.

As these cross motions involve, at least in some measure, consideration of pertinent contractual provisions, we note that both parties submitted the original, 2005 lease and the 2008 Amendment in support of their motion for partial

13

summary judgment. Louisiana Civil Code Article 2045 explains that: "Interpretation of a contract is the determination of the common intent of the parties." However, if "the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La.Civ.Code art. 2046. Generally, "[t]he words of a contract must be given their generally prevailing meaning." La.Civ.Code art. 2047. However, "[w]ords of art and technical terms must be given their technical meaning when the contract involves a technical matter." *Id*.

In this regard, the Estate asserts that the Amendment clearly and explicitly defines the alternate well as a "Subsequent Well" under its own terms. The Estate notes that the Amendment references the drilling of the original well (referencing it as the Unsuccessful Well)[10] as well as PetroQuest's proposal to drill another well (the Second Well). As noted above, the Amendment thereafter provides:

> Notwithstanding the provisions of sub-paragraphs (h)(i) and (h)(ii) of this lease, **Lessor and Lessee agree that for any well drilled on lands covered by this lease or on lands unitized therewith after the drilling of the Second Well ("Subsequent Wells"), royalty payable under this lease on production from Subsequent Wells shall increase to Twenty-three (23.00%) percent**, but shall otherwise be calculated in accordance with the applicable provisions of this lease.

(Emphasis added.) The Estate suggests that the emphasized language is not "technical" in nature, and must therefore be given its generally prevailing meaning pursuant to La.Civ.Code art. 2047. Observing that PetroQuest and the Estate "agreed that production from any well drilled after the Second Well would be paid at 23%[,]" it argues that the "question presented by this case is straightforward –

---

[10] The Amendment indicates that the Estate and PetroQuest acknowledged that "PetroQuest . . . has first drilled [the original well], on lands unitized with the lands covered by this lease, which well was not successfully completed, and PetroQuest . . . has proposed the drilling of a second well either on the lands covered by this lease or on lands unitized therewith . . . ."

14

was the Alternate Well drilled after the Second Well?"  After review, we find genuine issues of material fact preclude summary judgment.

While the Amendment clearly provides that the original well "was not successfully completed," that a Second Well was proposed, and that royalties on production from Subsequent Wells were to be paid at a higher rate, the Estate erroneously concludes that the contract is, thus, clear and explicit that the alternate well is a "Subsequent Well."  The question posed by the concursus proceeding is not whether the alternate well was drilled after the Second Well, but is instead whether the alternate well constitutes a Subsequent Well or whether it is merely a continuation of the original well, as urged by Mr. Banks.

This latter question is factual in nature and must be resolved outside of the pertinent contracts, as they are otherwise silent on that issue.  And, it is on this factual basis that both parties' motions for partial summary judgments fail. Simply, the parties' submissions do not provide an adequate factual context as to the drilling of the alternate well to resolve the question presented here.

For example, Mr. Banks suggests that the fact that the Office of Conservation maintained the same well serial number—235876—from the original well to the alternate well is factually significant.  However, he offers no evidence regarding the Office of Conservation's practice of maintaining serial numbers, nor how such the practice is treated in the industry.  He instead presents the bare fact as determinative.  Although Mr. Banks supported his motion with an excerpt from a 1979 American Petroleum Institute bulletin, entitled "The API Well Number and Standard State and County Numeric Codes Including Offshore Waters," the offering was entered into evidence without an attached affidavit or deposition so to

15

assist with consideration of whether it resolved the issue of classification of the well.

The Estate's submission is similarly deficient, instead relying on the circumstances of the drilling of the alternate well, without providing a framework for consideration of whether those circumstances reveal that, in fact, the alternate well constituted a "Subsequent Well." In its brief, the Estate suggests that, "the Alternate Well was both proposed and drilled after the Second and Third Wells, and created almost a mile of new borehole that was cased and completed at an approximate additional expenditure of over $18 million[.]"[11] However, the Estate again provides no evidence that would assist in determining whether those facts/allegations resulted in a well that was either a continuation of the original well or a new, "Subsequent Well."

The existence of this type of unresolved factual inquiry is demonstrated by each party's introduction of texts purporting to define "sidetracking," an operation used in the drilling of the alternate well. Albeit from different editions of the same text, both parties introduced an excerpt from the "Manual of Oil and Gas Terms,"

---

[11] The submissions include August 6, 2014 correspondence from PetroQuest to Mr. Banks following his inquiry into the royalty rate paid on the alternate well. In challenging Mr. Banks' assertion that the alternate well did not constitute a Subsequent Well, and in relating the history of the alternate well, PetroQuest explained, in part, that:

> The Broussard No. 1 Alt Well was drilled over four years after the unsuccessful drilling and abandonment of the Broussard No. 1. While the upper portion of the original wellbore was used as a significant cost saving measure for the partnership, the well was sidetracked at 13,780 feet and drilled another 4,255 feet. Approximately $7.7 million was spent on drilling, sidetracking and approximately $10.7 million was spent completing the Broussard No. 1 Alt Well. It was drilled by different parties, as many original Broussard No. 1 Well participants had withdrawn. PetroQuest had to bring in new parties to drill the well. The well was proposed as a subsequent operation under a new operating agreement.

ostensibly each finding favor in that definition.[12] Again, that definition was entered into the record without demonstration of whether it was definitive as to the classification of the alternate well.[13] Furthermore, the parties' placement of such

---

[12] While Mr. Banks provided an excerpt from the work's Thirteenth Edition and the Estate and PetroQuest provided the Fifteenth Edition, the definitions under both reflect:

**Side tracking**

     (1)    An operation involving the use of a portion of an existing well to drill a second hole, resulting in a well that is partly old and partly new.

     "Rather than starting at the surface with a new hole and setting new casing strings all the way, it may be less expensive to utilize a portion of the casing in the original cased hole. To do this, a milling tool is used to grind out a 'window' through the side of the casing at some selected depth. After this is done, a whipstock is utilized to direct a drilling bit out of the window at some desired angle into previously undrilled earth strata. From this directional start a new hole is drilled to the desired formation depth and casing is set in the new hole and tied back to the older casing." Shell Oil Co. v. Federal Energy Regulatory Comm'n, 707 F.2d 230, 233, 79 *O.&G.R.* 186, 190 (5th Cir. 1983) (dealing with the vintaging of gas produced as a result of side-tracking).

     *See also* Ebberts v. Carpenter Production Co., 256 S.W.2d 601, 2 *O.&G.R.* 726 (Tex. Civ. App. 1953, error ref'd n.r.e.).

     Placid Oil Co. v. Federal Energy Regulatory Comm'n, 875 F.2d 487 (5th Cir. 1989), vacated a commission finding that certain secondary drilling operations did not amount to sidetracking on the ground that the commission had inexplicably departed from its prior definition of the term by adding several new requirements.

     Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773, 94 *O.&G.R.* 601 (5th Cir. 1986), *cert. denied*, 481 U.S. 1015 (1987) sustained a jury finding that a side tracking operation was a continuation of the original well as distinct from a subsequent or other operation as defined in an operating agreement.

     (2)    Drilling past obstructions in a well.

The Estate and PetroQuest also introduced an excerpt from the "Handbook of Oil Industry Terms and Phrases," defining "side tracking" as: "Drilling of another well beside a non-producing well and using the upper part of the non-producer. A method of drilling past obstructions in a well, i.e., lost tools, pipe, or other material blocking the hole." Whereas Mr. Banks included "Definitions" from a "Model Form" published by the American Association of Professional Landmen, providing that: "'Sidetrack' shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or to drill around junk in the hole to overcome other mechanical difficulties."

[13] It is informative that one of the cases cited within the "Manual of Oil and Gas Terms" excerpt, *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773 (5th Cir. 1986), *cert. denied*, 481 U.S. 1015, 107 S.Ct. 1892 (1987), involved a jury's consideration of whether a sidetracking operation resulted in the continuation of a original well or whether it produced a distinct subsequent well. In noting that the sidetrack operation at issue was not clearly and unambiguously a subsequent or initial

industry-specific texts into the record belies the Estate's contention that the terms of the Amendment are not "technical" in nature, thus obviating the need for a search for a further technical meaning pursuant to La.Civ.Code art. 2047. On their face, operative terms within the Amendment such as "drilling" and "well" may have "generally prevailing meaning[s]." However, the parties here necessarily ask for consideration of the terms as they relate to the contours of the Amendment's phraseology of "any *well drilled* on lands covered by this lease or on lands unitized therewith after the drilling of the Second Well ("Subsequent Wells")[.]" (Emphasis added.) Simply, there is no testimony or evidence as to the terms' technical meanings that would resolve the issue of whether the sidetracking operation employed for the completion of the alternate well constituted a continuation of the original well or whether it constituted the drilling of a separate, distinct Subsequent Well. Rather, the parties' bare assertion of facts and allegations, without context as to industry standards and practices, do not demonstrate that either will be able, or unable, to "establish that he will be able to satisfy his evidentiary burden of proof at trial[.]" La.Code Civ.P. art. 966(C)(2). Rather, the facts as advanced are not determinative, are triable, and are ones upon which reasonable persons could disagree.

Accordingly, genuine issues of material fact remain, indicating that the trial court erred in granting the motion for partial summary judgment in favor of Mr. Banks. *See Smith v. Our Lady of the Lake Hosp.*, 93-2512, p. 27 (La. 7/5/94), 639 So.2d 730, 751 (explaining that: "A 'genuine issue' is a 'triable issue.' More

---

operation under the Operating Agreement under review, it noted that "[m]uch of the testimony at trial was devoted to resolving this ambiguity." *Id.* at 780. (Footnote omitted.) Contrarily, no such explanatory evidence has been produced in support of the parties' respective positions in the present case.

precisely, '[a]n issue is genuine if reasonable persons could disagree.'") (citations omitted).  Thus, we below reverse the motion for summary judgment entered in favor of Mr. Banks.  For this same reason, we do not find it appropriate to grant the motion for partial summary judgment in favor of the Estate.  Rather, we remand this matter for further proceedings.

## DECREE

For the foregoing reasons, the exception of no right of action filed in this court by defendant/appellant, Isadore Delcambre Estate, is denied.  The judgment entering partial summary judgment in favor of the defendant/appellee, Sam L. Banks is reversed.  This matter is remanded for further proceedings.  Costs of this proceeding are assessed equally to Mr. Banks and to the Estate.

**EXCEPTION OF NO RIGHT OF ACTION DENIED.  PARTIAL SUMMARY JUDGMENT REVERSED.  REMANDED.**